UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

LUITPOLD PHARMACEUTICALS, INC.,

                          Plaintiff,

                -v-

ED. GEISTLICH SOHNE A.G. FUR
CHEMISCHE INDUSTRIE, and
OSTEOMEDICAL LTD.,

                     Defendants.

------------------------------------------------------------- X

| |
|---|
| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: September 16, 2015 |

11-cv-681 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

     After several years of litigation, this action is set for trial commencing on

September 21, 2015.  The parties have filed a total of 11 motions in limine.[1]  Several

of the motions argue that certain evidence is irrelevant, misleading, or would waste

time, and certain are directed at the qualifications of proposed experts or the

reliability of their opinions.   The Court's rulings are set forth below.

## I.      IN LIMINE MOTIONS GENERALLY

     In limine motions can play an especially important and useful role in a jury

trial, allowing the parties to seek rulings in advance as to issues that otherwise may

require extensive side bars or argument that can interrupt the proceedings.  See

Palmieri v. Defaria, 88 F.3d 136, 141 (2d Cir. 1996); accord Highland Capital

Mgmt., L.P. v. Schneider, 551 F. Supp. 2d 173, 176 (S.D.N.Y. 2008).  Well-grounded

in limine motions may also require the parties to sharpen their focus on the real

issues in a case and streamline their presentations. See In re Methyl Tertiary Butyl

---

[1] An additional motion in limine, not decided in the instant decision, is at ECF No. 216.

Ether Prods. Liab. Litig., 517 F. Supp. 2d 662, 666-67 (S.D.N.Y. 2007). That is certainly the case here.

The Court's role with regard to such pre-trial rulings is grounded in rule 104 of the Federal Rules of Evidence.  That rule "requires that a court make a preliminary determination of the admissibility of all evidence." SEC v. Tourre, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013). In the context of a pre-trial in limine ruling, challenged evidence "should only be precluded when it is 'clearly inadmissible on all possible grounds.' " Id. (quoting Commerce Funding Corp. v. Comprehensive Habilitation Servs., Inc., No. 01 Civ. 3796, 2005 WL 1026515, at *3 (S.D.N.Y. May 2, 2005)).

In limine rulings are "necessarily preliminary — and [] subject to change when the case unfolds." Id. at 676 (citing Highland Capital Mgmt., 551 F. Supp. 2d at 176; Commerce Funding, 2005 WL 1026515, at *4). "A foundation may be laid contrary to expectations; relevance may appear where previously considered unlikely; the balancing of factors under Rule 403 may change as events in the courtroom drama unfold.  The Court recognizes that trials often contain unexpected moments and developments, and the parties should bear those developments in mind when determining whether to drop or re-raise an issue decided by this order." Id.

A.  Relevance

It is often the case that parties use in limine rulings to establish the scope of a trial.  Rule 402 provides a primary tool for this.  Under Rule 402, evidence must

be relevant to be admissible.  Fed. R. Evid. 402. Evidence is relevant if it has a tendency to make a fact that is of consequence in determining the action more or less probable than it would be without the evidence.  Fed. R. Evid. 401.  Irrelevant evidence "is not admissible." Fed. R. Evid. 402.

B.  Rule 403

Even if relevant, evidence may still be precluded if a court finds that, on balance,  "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  The Second Circuit has instructed that the "[d]istrict courts have broad discretion to balance probative value against possible prejudice" under Rule 403. United States v. Bermudez, 529 F.3d 158, 161 (2d Cir. 2008) (citing United States v. LaFlam, 369 F.3d 153, 155 (2d Cir. 2004)).

Using the rules of evidence as an ultimate guide, the Court's in limine rulings provide for a case to be tried to the jury which focuses on the fact issues in dispute, minimizing or eliminating unnecessary and distracting forays.

II.    DAUBERT MOTIONS

Pre-trial motions with regard to experts has an additional body of case law upon which it draws.  It is well accepted that "expert testimony may help a jury understand unfamiliar terms and concepts."  United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991).  However, a trial court is obligated to act as a gatekeeper with respect to expert testimony.  See Daubert v. Merrell Dow Pharm., Inc., 509

U.S. 579, 597 (1993); <u>see also</u> <u>Major League Baseball Props., Inc. v. Salvino, Inc.</u>, 542 F.3d 290, 311 (2d Cir. 2008). "The primary locus of this obligation is Rule 702, which clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify." <u>Daubert</u>, 509 U.S. at 589. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. To determine whether a proposed expert's testimony passes muster under Rule 702, this Court must inquire into: (1) the qualifications of the proposed expert; (2) whether each proposed opinion is based upon reliable data and reliable methodology; and (3) whether the proposed testimony would be helpful to the trier of fact. <u>See, e.g.</u>, <u>Nimely v. City of New York</u>, 414 F.3d 381, 396-97 (2d Cir. 2005); <u>Arista Records LLC v. Lime Group LLC</u>, No. 06 Civ. 5936, 2011 WL 1674796, at *1 (S.D.N.Y. May 2, 2011). The party seeking to introduce and rely on expert testimony bears the burden of establishing that the proposed expert and his or her testimony meets the requirements of Rule 702 by a preponderance of the evidence.

Daubert, 509 U.S. at 593 & n.10; United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007); Arista Records, 2011 WL 1674796, at *1.

A court's inquiry into a proposed expert's qualifications is a threshold question conducted under Rule 104(a) of the Federal Rules of Evidence — one that seeks to determine whether the proposed expert is, in fact, an expert in the area in which he or she intends to testify. See Fed. R. Evid. 104(a); Daubert, 509 U.S. at 593 & n.10; see also Arista Records, 2011 WL 1674796, at *2. Whether a proposed expert has the requisite qualifications depends on his or her educational background, training, and experience in the field(s) relevant to the opinions he or she seeks to give. See Arista Records, 2011 WL 1674796, at *2; see also United States v. Tin Yat Chin, 371 F.3d 31, 40 (2d Cir. 2004); Cary Oil Co., Inc. v. MG Ref. & Mktg., Inc., No. 99 Civ. 1725, 2003 WL 1878246, at *2 (S.D.N.Y. Apr. 11, 2003). Courts have construed the inquiry into an expert's qualifications with an eye towards the "'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to 'opinion testimony.'" Daubert, 509 U.S. at 588-89; see also In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 559 (S.D.N.Y. 2004) ("The Second Circuit has taken a liberal view of the qualification requirements of Rule 702, at least to the extent that a lack of formal training does not necessarily disqualify an expert from testifying if he or she has equivalent relevant practical experience.").

A court's inquiry into the reliability of a proposed expert's testimony "entails a preliminary assessment of whether the reasoning or methodology underlying the

testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592-93. Among the questions to be answered are whether the theory or methodology can be  (and has been) tested, whether it has been subjected to peer review and publication, what its known or potential rate of error is, and whether it is a generally accepted methodology or theory. Id. at 593-94.

There are, however, limitations which a court can, and indeed sometimes must, place upon even a qualified expert proposing to testify as to some admissible opinions. For instance, the court may preclude an expert from testifying as to the credibility of other witnesses or evidence. See United States v. Scop, 846 F.2d 135, 142 (2d Cir. 1988), modified by 856 F.2d 5 (2d Cir. 1988); In re Blech Sec. Litig., No. 94 Civ. 7696, 2003 WL 1610775, at *21-22 (S.D.N.Y. Mar. 26, 2003); LinkCo, Inc. v. Fujitsu Ltd., No. 00 Civ. 7242, 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002).

Rule 403 is as applicable to expert testimony as it is to percipient witnesses or other evidence and permits the exclusion of relevant evidence if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Daubert, 509 U.S. at 595 (quoting Fed. R. Evid. 403).

Additionally, expert testimony may not usurp the province of the judge to instruct on the law, or of the jury to make factual determinations. See Bilzerian, 926 F.2d at 1294; Marx & Co. v. Diner's Club, Inc., 550 F.2d 505, 510-11 (2d Cir. 1977). While an expert "may opine on an issue of fact within the jury's province, he

6

may not give testimony stating ultimate legal conclusions based on those facts." Bilzerian, 926 F.2d at 1294.  Moreover, "[a]lthough testimony concerning the ordinary practices in [a particular] industry may be received to enable the jury to evaluate a defendant's conduct against the standards of accepted practice, testimony encompassing an ultimate legal conclusion based upon the facts of the case is not admissible, and may not be made so simply because it is presented in terms of industry practice."  Id. at 1295 (citation omitted).

It is also inappropriate for experts to become a vehicle for factual narrative. See Island Intellectual Prop. LLC v. Deutsche Bank AG, No. 09 Civ. 2675, 2012 WL 526722, at *2 (S.D.N.Y. Feb. 14, 2012); Highland Capital, 551 F. Supp. 2d at 187; In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 551.  Acting simply as a narrator of the facts does not convey opinions based on an expert's knowledge and expertise; nor is such a narration traceable to a reliable methodology.  Mere narration thus fails to fulfill Daubert's most basic requirements.  See In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d at 551.  In addition, narration of facts of the case may easily invade the province of the jury, providing a separate basis for exclusion.  Id.

### III.    MOTIONS AS TO PROPOSED EXPERTS

Both parties have moved to preclude various experts.  As explained below, the Court grants some of these motions and not others.

### A.  Martin J. Dymek

Luitpold has moved to preclude the testimony of Martin J, Dymek, Geistlich's proposed expert on "what constitutes best efforts in dental sales and marketing."

(Dymek Report at ¶ 1.)  (ECF No. 330, Luitpold MIL No. 1.)  According to Luitpold, "[a]ll of Dymek's opinions should be excluded because they are unhelpful, unreliable opinions that fail to meet the requirements of Federal Rule of Evidence 702." (ECF No. 331, Br. at 1.)  Luitpold contends that Dymek ignores a controlling contractual provision defining best efforts, and instead inappropriately resorts to "industry standards." (Id. at 4-8.)  In addition, Luitpold argues that even the industry standards to which Dymek refers are unreliable. (Id. at 9-12.)  As discussed below, the Court agrees.

Paragraph 2.02 of the contract sets forth the "best efforts" provision that forms the basis of Geistlich's Counterclaim III.  That provision provides:

> BUYER agrees that it will use its best efforts to expeditiously enter and develop markets in and to the PRODUCT for the FIELD OF USE in the TERRITORY and will use its best efforts to commence execution of the business plan (attached hereto as Appendix D) within forty-five (45) days after signing this COMMERICAL AGREEMENT and thereafter will use its best efforts to continue the execution of the business plan.  The Buyer agrees that the execution of the business plan will be a significant development project in the use of Buyer's resources.

In its third counterclaim, Geistlich alleges that Luitpold breached its obligation to "use its 'best efforts' to develop markets in and to GEISTLICH products and . . . to execute the Exhibit D business plan." (ECF No. 38, C.Cl. ¶ 37.)  Luitpold is alleged to have acquired marketing rights to, and in fact marketed, a competing product from BioMimetic Therapeutics based on platelet-derived growth factor ("PDGF"). (Id., C.Cl. ¶ 38.)  The specific product that is the subject of this allegation is GEM21S. (Id., C.Cl. ¶ 39.)  Geistlich asserts that the Luitpold sales

force "attempted to sell GEM21S to the very same dentists and oral surgeons that were also customers for the purchase of GEISTLICH's Bio-Oss products." (Id., C.Cl. ¶ 42.)  In addition, Geistlich alleges that while Luitpold "initially understood and implemented the special efforts necessary to promote and market GEISTLICH's products," it later "stopped using such appropriate marketing methods."  (Id., C.Cl. ¶ 45.)  This, Geistlich asserts, led to a failure in Luitpold's obligation to use "best efforts" in marketing the Geistlich products by, among other things, failing to sponsor appropriate clinical studies, failing to sponsor certain speakers, failing to properly train a sales force, failing to maintain a sufficiently skilled and sized sales force, failing to maintain sufficient professional medical staff, failing to maintain a sufficiently large marketing and promotions staff, failing to sufficiently emphasize to its sales force the importance of building relationships, failing to engage in sufficient education-based product development, and failing to maintain good relationships with opinion leaders. (Id.)

Geistlich also alleges that Luitpold "entered into agreements with NIBEC Co., Ltd. ('NIBEC') to sell directly competitive products." (Id., C.Cl. ¶ 46.)  NIBEC manufactures a dental bone implantation known as OCS-B, and a dental implantation material known as OCS-H. (Id., C.Cl. ¶ 47.)  In the U.S., the OCS-H product is marketed under the name "EquiMatrix."  (Id., C.Cl. ¶ 48.)  A filing with the Food and Drug Administration ("FDA") states that EquiMatrix is "substantially equivalent to Bio-Oss." (Id., C.Cl. ¶¶ 49-53.)

In his summary of opinions, Dymek states that:

(1) "a best efforts level of performance in the dental surgical specialty market is well is understood…" and "best efforts in the dental surgical specialty market is commonly understood to require  a level of financial commitment to successfully promote the product;"

(2) "best efforts in the sale of regenerative products in the dental surgical specialty market is unique" and includes many of the activities set forth in paragraph 45 of Geistlich's counterclaim;

(3) "Luitpold's actions do not reflect a sufficient commitment of financial and other resources to support Geistlich's products," and thus violate "its contractual promise of 'best efforts' support for the Geistlich products;"

(4) the agreements between Geistlich and Luitpold generated sufficient financial gain for Luitpold to fund an industry standard level of best efforts but that Luitpold instead used resources to fund the selling and marketing of other Luitpold products.

(Dymek Report at ¶ 13.)  Dymek states that his opinions are based on the totality of his education, training and experience including "the sales and marketing activities required to meet the dental industry standard of 'best efforts' support…" (Dymek Report at ¶ 15.)   Dymek then states that while there is no "silver bullet" to determine best efforts in "sales and marketing," most companies do a number of activities "well and frequently." (Dymek Report at ¶ 22.)  Dymek phrases these activities as, inter alia, maintaining an adequate number of field sales representatives, hands on training, customer events and scientific conferences,

courting key opinion leaders, and constant clinical research.  (Dymek Report at ¶ 22.)

Dymek dedicates a substantial portion of his report thereafter to discussing what he refers to as "the competition" to determine their allocation of "their limited financial resources" and how they prioritize their spending to "support the sales and marketing."  (Dymek Report at ¶ 26 et seq.)  In particular, he focuses on Nobel Biocare and Straumann.  (<u>Id.</u>)

Dymek's entire report – each and every one of his opinions – is directed at the industry standard for sales and marketing of dental surgical specialty products. That is a different best efforts standard than that to which the parties contractually agreed.

Paragraph 2.02 certainly includes a best efforts requirement.  That provision does not, however, set forth a requirement that Luitpold reach and maintain an industry standard level of best efforts for sales and marketing of specialty surgical dental products.  Instead, it is a best effort requirement specifically directed at only (1) entering and developing markets in and to the products, and (2) commencing and continuing execution of the business plan.  Arguably, the entry and development requirements are limited to the first 45 days following contract execution; whether those obligations survive those 45 days is a question of contract interpretation.  Thus, the questions that the trier of fact must answer on the basis of record evidence and expert testimony include at least three major inquiries:

The first inquiry relates to what it means to "enter" markets as used in this provision. The contract must be the starting point. What does the evidence show was the intent of the parties in using that word? If there is no record evidence as to the meaning of this term, is it a term recognized in the industry? Is the word ambiguous? Does "enter" mean acquire a certain number of customers, a certain amount of recognition, a particular initial market presence, sales level, or geographic spread? Is it a concept applicable to a particular time period following initial product introduction into a market? When has entry been completed? Dymek does not offer an opinion as to "entry."

The second inquiry asks what it means to "develop" markets as used in this provision. One must start, again, with the contract. Is the word "develop" ambiguous? As a matter of contractual intent, what was the term intended to encompass? Was the word "develop" a term of art in the industry in 1994 and, if so, what did it mean? Does "develop" relate generally to initial market creation, or does it mean obtain customer interest? If so, how much? Is there a difference between developing a market and occupying a position in a "developed" market? Is "developing" a market equivalent to <u>commencing</u> sales and marketing or does it refer to <u>all</u> sales and marketing, even in a well-developed market? In the dental surgical specialty industry, is "developing" a market a concept useful in the initial stages of product introduction but not thereafter? When has a market been "developed"? Is it an ever-ongoing process? Dymek does not offer opinions on any of these topics either.

The third inquiry relates to the business plan to which the end of the first sentence of paragraph 2.02 refers.  The contract is the starting point.  What plan is being referred to here?  What did the parties intend?  If the parties intended that Luitpold use best efforts to meet the standards set forth in Exhibit D, does that mean that the parties intended that this provision would only continue for the five year period set forth in that plan?  If the parties intended that the obligation would continue beyond that, is there an equivalent plan or plans to be referenced "thereafter"?  In the absence of such a plan, is there evidence that the parties intended that the default would be industry standards, and if so, as to what?  Industry standards regarding the activities listed in the Exhibit D business plan?  Retained commitment to a sales team with 6-8 territory managers in 8-10 states?  Is there any evidence that the parties intended to default to the necessarily unknown industry standards for sales and marketing that would exist in the future?  Dymek's report similarly does not address these questions.  Instead he assumes, without reliance on anything of record, that it is appropriate to apply the industry standards for sales and marketing that existed in 2011 and later.

Whatever the ambiguities around the terms "enter" and "develop," it is at least clear that with regard to the business plan, initial best efforts were defined by Exhibit D.  It seems quite plausible that the efforts required "thereafter" were also defined with reference to the same plan; in the context of an initial 45-day commitment, the "thereafter" could refer to the remainder of the 5-year plan.  It is also plausible that these later efforts were intended to refer to a different plan.

What the Exhibit D plan does not do is reference anything along the lines of "industry standards" for sales and marketing efforts or require the parties to dedicate the same financial resources to those efforts that their competitors do. Indeed, the Commercial Agreement never uses the term "industry standard".

The business plan attached as Exhibit D does contain specific references that, one would think, an expert could have used as benchmarks: overall market size; "markets which can be reached economically;" a marketing strategy that "will encompass" the following items on a bulleted list: teaching institutions, opinion leaders, regional symposiums, high frequency maxillofacial surgeries, trade shows and exhibits, teaching video tape series, direct mail, journal advertising/promotion /product information, in-house technical service department, and on-going clinical research and publications. (ECF No. 1-1, Exh. D at 12-13.)  In addition, the Exhibit D plan references differentiating the product in part by profiling it at certain teaching institutions, a strategy that involved prominent specialists supported by well-trained medical representatives.  (Id. at 14-15.)  The plan called for the sales force to eventually consist of 6-8 Territory Managers and be deployed in 8-10 states. (Id. at 15.)  It was anticipated that personnel would attend certain meetings and trade shows and there would be certain advertising placement. (Id. at 16-17.)  The plan states further that it "requires dedication and commitment." (Id. at 18.)

Dymek does not rely on the business plan attached at Exhibit D to the Commercial Agreement or any other in connection with rendering his opinions.  He testified at his deposition as follows:

14

Q:  Is this the standard you used in approaching your work on this case . . . "thereafter Luitpold will use its best efforts to continue execution of the business plan"?

A:  I looked at it and felt there was an evolution involved there that the business plan presented a plan, an allocation of financial resources for an initial five-year period. And then we needed to evaluate the ongoing market conditions, the ongoing requirements of the market to continue to support a best efforts strategy based not on the business plan, but based on the demands of the market during the period of time following the end of that first business plan.

(ECF No. 332, Cuniff Decl. Exh. 1 at 56:7-21.)

The Court is not aware of any factual basis for Dymek's assumption that the parties intended the best efforts obligation to refer to "the ongoing requirements of the market" in the absence of an identifiable "business plan." The contract called for continuing best efforts to execute "the business plan," not to adopt a strategy explicitly <u>not</u> based on the plan attached as Exhibit D or any other.

Expert opinion on a party's compliance with an industry standard is irrelevant when its obligations are contractually defined.  <u>See, e.g.</u>, <u>LaSalle Bank Nat'l Ass'n v. CIBC Inc.</u>, No. 08 Civ. 8426, 2012 WL 466785, at *12 (S.D.N.Y. Feb. 14, 2012).  Under New York law, neither the Court nor a jury may unilaterally develop and impose a post hoc standard with which the parties to a contract must comply. <u>In re World Trade Ctr. Disaster Site Litig.</u>, 754 F.3d 114, 122-23 (2d Cir. 2014); <u>Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC</u>, 813 F. Supp. 2d 489, 516 (S.D.N.Y. 2011); <u>Mocca Lounge, Inc. v. Misak</u>, 462 N.Y.S.2d 704, 707 (N.Y. App. Div. 1983). Allowing Dymek's evaluation of whether Luitpold used its "best efforts" to market and sell Geistlich's products as a general matter to go to

15

the jury would invite just such an imposition.  As Dymek's opinions are untethered to the contractual standard at issue, they are irrelevant and would be unhelpful and misleading to the trier of fact.  Any probative value in the opinions is substantially outweighed by the danger that the jury would be seriously misled.

Even if the Court did not preclude the opinions on these bases, it would nevertheless find that the methodology Dymek purports to use is internally inconsistent and fails to meet <u>Daubert</u>'s standards.

As set forth above, Dymek purports to establish that whether sales and marketing efforts represent best efforts may be determined by examining a series of factors he lists in paragraph 22 of his Report.  He testified that he identified these factors based on his own experience, not the business plan attached as Exhibit D (which had a different list).  (ECF No. 332, Cuniff Decl. Exh. 1 at 74:2-75:21.)  However, Dymek's list appears to be merely ipse dixit, not drawn from any verifiable data, even if that data is qualitative.  While it is certainly true, as Geistlich argues in opposition to this motion, that Dymek is testifying based on experience and not on scientific data, that does not mean that the Court's concerns with ipse dixit disappear.  All experts testify to some extent based on experience.  There must be some verifiable way of demonstrating the validity of each of the items on his list.  <u>See</u> <u>Amorgianos v. Nat'l R.R. Passenger Corp.</u>, 303 F.3d 256, 266 (2d Cir. 2002) ("[N]othing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." (alteration in original) (quoting <u>Gen. Elec. Co.</u>

v. Joiner, 522 U.S. 136, 146 (1997))). For instance, Dymek could have documented the presence of the factors he identified in the annual reports or other public filings of appropriate competitor companies, in promotions or advertisements, in brochures from conferences, etc.  The list of documentation that might exist is long indeed – but it is not for the Court to imagine that evidence supportive of his assertions may exist or assume that it does based upon the witness's say so. See, e.g., Zenith Elecs. Corp. v. WH-TV Broad. Corp., 395 F.3d 416, 418 (7th Cir. 2005) (Easterbrook, J.); Grdinich v. Bradlees, 187 F.R.D. 77, 81-82 (S.D.N.Y. 1999).

After laying out the list of factors that comprise "best efforts," Dymek proceeds not to even apply them.  He never analyzes the number of Luitpold sales representatives or their call frequency, nor does he analyze whether Luitpold provided adequate hands-on training or promoted the image of the company, or sponsored enough events, or interviewed opinion leaders in the industry.  (ECF No. 332, Cuniff Decl. Ex. 1, 83:21-85:16, 89:20-90:2, 92:10-16, 93:17-94:20.) It is not clear that Dymek could measure Luitpold's activities against his proffered standard. Dymek states that best efforts are dependent on doing the activities he identifies "very well and very often," but is unable to quantify or estimate when that standard is met.

Indeed, as already stated, Dymek's report abandons the factors it lists as the basis of a best efforts determination shortly after it identifies them.  Instead, he utilizes a "financial ratio" that evaluates the percentage of total revenue that went to certain types of expenses to compare the marketing approach Luitpold adopted

with the approaches selected by two other companies, Straumann and Nobel Biocare. (Dymek Report at ¶ 27.)  He does not explain the basis for selecting this financial ratio over any other.  (Id.)  Nor does he set forth how or why he chose these companies or how their businesses may compare to or differ from Luitpold's.  In fact, Dymek conceded at his deposition that the financial ratio is not found in the Commercial Agreement and that he had not seen it in any industry, academic, or other context outside of this litigation. (ECF No. 332, Cuniff Dec. Exh. 1, at 100:13-103:8.) Similarly, Dymek does not cite business documents that would suggest that Luitpold or Geistlich ever viewed Straumann or Nobel Biocare as setting the example of the type of sales and marketing efforts that the parties expected of Luitpold.  (See, e.g., ECF No. 332, Cuniff Decl. Exh. 1 at 105:14-126:12.)  As a result, there is no basis upon which the parties or the Court may determine whether these companies, and more specifically their marketing investments, are appropriate points of comparison.  As Luitpold notes, there are clearly unanswered questions raised by this methodology such as whether product introductions or acquisitions impacted the Nobel or Straumann numbers.  Additionally, the nature of the ratio Dymek is to reward spending more money less efficiently; if total sales increase and expenses decrease, the "financial ratio" would classify this as a negative development.  While some of this could be the subject of cross-examination, the Court finds that the totality of issues with Dymek's opinions render them unreliable.

For all of the reasons set forth above, Dymek's proposed testimony is precluded. Accordingly, Luitpold's first motion in limine (ECF No. 330) is GRANTED.

B. Dr. Joel W. Hay and Gary Frazier

Luitpold has proffered Dr. Joel W. Hay and Gary Frazier as rebuttal experts to Dymek. As the Court has precluded Dymek, there is no longer any reason for either to testify. The Court therefore GRANTS Geistlich's third and fifth motions in limine (ECF Nos. 343, 349.) to preclude them for that reason alone.[2]

C. Michele Riley

Michele Riley is Geistlich's proposed damages expert. She offers opinions about two categories of damages: those stemming from the "true up" that Geistlich alleges it is owed in Counterclaim II, and those stemming from the alleged failure by Luitpold to use its "best efforts" to market Geistlich's products that is the basis of Geistlich's Counterclaim III. Luitpold has moved to exclude some of Riley's opinions as to damages as they relate to Counterclaim II and to exclude her opinions entirely as they relate to Counterclaim III. (ECF No. 358.)

The flaw Luitpold purports to identify in Riley's testimony as to Counterclaim II relates to her calculation of prejudgment interest. According to Luitpold, Riley improperly applies an inapplicable interest rate set out in the Commercial Agreement rather than New York's statutory interest rate. See N.Y.

---

[2] Although Geistlich has only specifically moved to preclude the rebuttal expert testimony of Frazier and Dr. Hay, to the extent any other experts similarly merely rebut Dymek's opinions those experts too are now unnecessary and thus precluded.

C.P.L.R. § 5004.  Luitpold also faults Riley's selection of June 30 of each relevant year as the date from which interest is to be calculated.

Geistlich argues in opposition that the interest rate defined by the contract does apply to the damages alleged here and thus displaces the statutory interest rate.  See Citibank, N.A. v. Liebowitz, 487 N.Y.S.2d 368, 369 (N.Y. App. Div. 1985). While Luitpold portrays the contractual interest rate as being "limited to [unpaid] invoices," Geistlich argues for a broader application.  It points out that the provision at issue, in paragraph 7.04 of the Commercial Agreement, refers not to unpaid invoices but instead to "overdue payments contemplated in ARTICLE VI and this ARTICLE VII."  The first paragraph of Article 7, in turn, is the provision that defines the purchase price that Geistlich's Counterclaim II alleges Luitpold failed to pay.  The Court therefore agrees with Geistlich that it is inappropriate to rule, on the basis of an in limine motion, that the interest rate defined in the contract does not apply to the damages Geistlich seeks in Counterclaim II.

 As to Luitpold's criticism of Riley's selection of June 30 of each year as the date from which interest is calculated, the Court agrees with Luitpold that it is for the trier of fact to fix the date from which interest is to be computed, but does not preclude Riley's testimony on these grounds.  As Geistlich argues, Riley's choice of date stemmed from her calculation method.  Its validity is a proper grounds for cross-examination, not preclusion.

Luitpold has separately moved to preclude Riley's testimony on the damages Geistlich suffered due to Luitpold's alleged failure to comply with its best efforts

20

obligation.  Luitpold argues that Riley's report is founded on two unsupported assumptions: first, that Luitpold breached its best efforts obligation, and second, that this breach was responsible for any and all differences between the revenue growth for its Geistlich products and the average revenue growth at Straumann and Nobel Biocare.

Geistlich responds that Riley, as a damages expert, is entitled to assume liability for purposes of calculating damages and need not perform her own causation analysis.  In this, Geistlich is correct; a damages expert does not need to perform her own causation analysis to offer useful expert testimony.  See, e.g., CRST Van Expedited, Inc. v. J.B. Hunt Transport, Inc., No. CIV-04-0651-F, 2006 WL 2054646, at *4 (W.D. Okla. July 24, 2006) ("For the purpose of presenting his damage calculation methods, [a damages expert] is entitled to presume causation (a prerequisite to recovery which will have to be established by evidence other than [his] testimony).").

Although Luitpold's first criticism falls short, the second flaw that Luitpold identifies in Riley's testimony undoes its reliability and helpfulness to the jury entirely.  Riley is a qualified accounting expert, but her lack of expertise in other areas led her to rely on Dymek as an industry expert as a starting point of her damages analysis.  She directly states as much in her report: she "rel[ies] on Mr. Dymek's opinion that 'but for' Luitpold's failure to use its 'best efforts' and its development or negotiation to develop competitive products, the Bios Products sales growth would have been consistent with comparable companies in the dental

regenerative industry during the period from 2006 through 2011, specifically Straumann and Nobel Biocare." (ECF No. 360, Cuniff Decl. Exh.1, Riley Report ¶ 61.)

If Dymek's opinions were admissible, Riley's reliance on them would not pose an issue.  But because, as discussed above, Dymek's opinions are precluded, the fundamental assumption underlying Riley's analysis disappears.  Riley uses Dymek as a basis to identify Straumann and Nobel Biocare as appropriate points of comparison by which to calculate damages.  Riley provides no independent basis for that comparison, nor for the selection of the revenue growth rate as the relevant point of comparison.  These choices were simply made "[i]n accordance with Mr. Dymek's opinion," (ECF No. 360, Cuniff Decl. Exh.1, Riley Report ¶ 61.) an opinion this Court has precluded as failing to meet the <u>Daubert</u> standard for helpful expert testimony.  Without Dymek, Riley's report cannot withstand even the initial scrutiny the Court must apply in its role as gatekeeper of expert evidence.[3]

The Court notes that it certainly agrees with Geistlich's argument that it "need only show a stable foundation for a reasonable estimate of the damages incurred as a result of the breach." <u>Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.</u>, 487 F.3d 89, 110 (2d Cir. 2007) (internal quotation marks omitted) (quoting <u>Contemporary Mission, Inc. v. Famous Music Corp.</u>, 557 F.2d 918, 926 (2d Cir. 1977)).  And the Court could certainly imagine expert testimony as to damages

---

[3] This is not a situation in which a party seeks to disqualify a comparison to another company on the merits of the comparison.  <u>See, e.g.</u>, <u>Bloor v. Falstaff Brewing Corp.</u>, 454 F. Supp. 258, 277 (S.D.N.Y. 1978), <u>aff'd</u> 601 F.2d 609 (2d Cir. 1979); <u>Washington v. Kellwood Co.</u>, 2015 WL 2258098, at *17 (S.D.N.Y. Apr. 21, 2015). Instead, in this case there is no competent evidence explaining the choice of points of comparison.

in this case that would be helpful to the jury as the trier of fact.  But the depth of

Riley's reliance on Dymek's views, combined with the Court's determination that

Dymek's testimony is precluded, renders Riley's opinion as to damages from a

breach of paragraph 2.02 of the Commercial Agreement inadmissible.

Luitpold's second in limine motion (ECF No. 358) is therefore GRANTED IN

PART and DENIED IN PART.

D. <u>Joseph J. Floyd</u>

Geistlich has moved to preclude the testimony of Joseph J. Floyd, Luitpold's

proposed rebuttal damage expert.  (ECF No. 346, Geistlich MIL No. 4.)  In his

Second Revised Rebuttal Report, dated August 7, 2015, Floyd asserts that he has

been retained to "[a]ssess the methodology and appropriateness" of Michele Riley's

damage analyses.  (ECF No. 348, Davenport Decl. Exh. 1 Floyd Report at ¶ 3.)

According to Geistlich, Floyd merely criticizes Riley for relying on certain business

records without performing an independent audit.  Geistlich also faults him for

failing to correct any purported errors and for seeking to offer factual narrative.

Finally, Geistlich argues that his opinions are not based on any accounting

expertise. (ECF No. 347.)

Luitpold responds that in fact Floyd did utilize his substantial accounting

experience in rendering his opinions and that he also used purchase orders, proofs

of payment, and other accounting records to perform an analysis of the price

Luitpold paid Geistlich for product.  (ECF No. 394.)  According to Luitpold, while it

is true that Floyd criticizes Riley for relying on a certain "underpayment reports" or

"price comparison schedules" as inconsistent with good accounting practice, that criticism is based on his accounting expertise as set forth in his report.  Moreover, his report further utilizes his expertise to identify flaws in Riley's methodologies.

The Court agrees with Luitpold that Floyd's proposed testimony meets the standards set forth in <u>Daubert</u> as well as additional caselaw regarding rebuttal experts.  The Court will not, however, allow Floyd or any other expert to give narrative factual testimony – under whatever guise it may be offered.  <u>See, e.g.</u>, <u>Highland Capital</u>, 379 F. Supp. 2d at 469 ("[A]n expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence.").  It is frankly unclear whether Floyd intends to offer such testimony live or whether any factual narrative in his report simply provides the foundation for his opinions. <u>See</u> <u>Reach Music Pub., Inc. v. Warner Chappell Music, Inc.</u>, 988 F. Supp. 2d 395, 404 (S.D.N.Y. 2013).

The task of a rebuttal expert is different from that of an affirmative expert. The Floyd Report is a standard rebuttal report of the type the Court would expect to see in response to the Riley Damages Report.  Floyd himself appears to have the necessary expertise, and Geistlich has no challenged his qualifications.

Based on his expertise and with substantial bases proffered for each opinion, Floyd opines that, inter alia,:

1.   The schedule on which Riley bases her "failure to pay the contract price" damages analysis was not tested; and that Riley has failed to apply the

standards to that document a CPA would apply for consulting service as to what constitutes "sufficient relevant data."

2. The appropriate standards require a practitioner to evaluate whether the information he or she is relying upon is "sufficiently reliable" and to obtain "audit evidence" in that regard.

A rebuttal expert, by nature, criticizes the methodology and/or opinions of another. There is no requirement that a rebuttal expert himself offer a competing analysis; his opinions may properly concern criticizing that presented by another party. See, e.g., In re Zyprexa Prods. Liab. Litig., 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007) ("[D]efendants' experts have a less demanding task, since they have no burden to produce models or methods of their own; they need only attack those of plaintiffs' experts.")

The issues that Geistlich raises with respect to Floyd are properly the subject of cross examination. It is perfectly appropriate for a rebuttal accounting expert to opine that it is not good accounting practice to rely on the type of document Riley relies upon. Pointing out alleged errors or inconsistencies that another expert relies on is a core task of most experts. To do that, Floyd need not himself have done the work that he asserts Riley should have done; it is enough that based upon his experience he is able to provide a reasoned basis for why she should have done so. The fact that Floyd grounds his opinions in accounting standards even while acknowledging "that Riley was not hired to perform an audit" (ECF No. 348, Davenport Decl. Exh. 1 Floyd Report at ¶ 13.) provides a basis for cross

examination, not preclusion.  It will be for the jury to decide whether to accept Floyd's opinion that a CPA relying on a financial document for a damages analysis into the millions of dollars should test the accuracy of that document according to some standard or to disregard that opinion and accept the validity of evaluating the document as a basis for damages.  All of this is a proper subject for cross examination and a finding by the jury, the trier of fact.

Floyd's proposed testimony goes further than simply criticizing reliance on a type of document; he proffers opinions as to methodological errors as well. (E.g., ECF No. 348, Davenport Decl. Exh. 1 Floyd Report at ¶ 52.) This topic is also a proper subject for a report from a qualified rebuttal expert.

Finally, to the extent Floyd rebuts portions of Riley's damages calculation relating to best efforts, to the extent those have been precluded as to her, they are to him in rebuttal as well.

Accordingly, Geistlich's fourth motion in limine (ECF No. 346.) is DENIED.

IV.     MOTIONS AS TO OTHER EVIDENCE

Both parties have also moved for a number of in limine rulings regarding other evidence. The Court's rulings on those motions are as set forth below.

A.  Board Minutes

Geistlich has moved to preclude the admissibility of certain minutes from meetings of Geistlich's board of directors as irrelevant under rule 402 or otherwise inadmissible under rules 403 or 408. (ECF No. 337.)  See Fed. R. Evid. 402, 403, 408.  Geistlich identifies 24 of Luitpold's proposed trial exhibits as containing such

minutes.  According to Geistlich, the minutes are offered to demonstrate Geistlich's financial position at various points in time, an issue not relevant to the resolution of any issue in the case to be tried, or to introduce matters relating to possible settlement, a topic that rule 408 largely excludes from consideration at trial. (Geistlich points to the Davenport Decl. Exhs. 17-22.)

Luitpold responds that Geistlich's motion is too general to place before the Court any appropriately defined issue that can be resolved in limine.  The Court agrees with Luitpold.  The Court should not be tasked with parsing this number of exhibits to determine which, if any, may raise issues with one of the multiple Rules of Evidence that Geistlich has invoked.  In the absence of a more specific objection as to a particular exhibit, the Court risks making a determination that Geistlich is not in fact seeking or on a basis not raised.

In contrast to Geistlich's too-general motion, Luitpold has proffered specific information in the board minute exhibits that is relevant to the issues to be tried. Luitpold also correctly points out that there are instances in which the circumstances of the parties at the time of contracting may have direct or circumstantial relevance to the provisions in the agreement.  It is thus not possible for the Court to rule at this juncture that any facts about Geistlich's financial condition contained in the board minutes are per se irrelevant.

Separately, the Court does note that in connection with its review of the parties' deposition designations it has found much of the proposed deposition testimony relating to the board minutes irrelevant.

As to any rule 408 issue, Luitpold argues that evidence of statements that predate a claim cannot be statements made in compromising or attempting to compromise that claim. See Beechwood Restorative Care Ctr. v. Leeds, 856 F. Supp. 2d 580, 591 (W.D.N.Y. 2012). The Court agrees with Luitpold on the legal standard. The Court does not know which particular documents Geistlich seeks to preclude under this standard and whether any or all of the documents meet this.  The Court will therefore not preclude the board minutes on a rule 408 ground in limine.

For the reasons set forth above, Geistlich's first motion in limine (ECF No. 337) is DENIED.

B. Evidence Regarding Richard Gering

At an earlier point in the history of this case, Geistlich retained Richard Gering as its damages expert.  It later withdrew him as an expert after it was discovered that he had not obtained the Ph.D. set forth on his resume. (See ECF No. 263.) Michele Riley was retained as a replacement.  In making that replacement, Geistlich made the tactical litigation decision to have Riley review and adopt the Gering report with only a few modifications.  (ECF No. 391, Witriol Decl. Exh. 1, Riley Tr. 21:11-25; 26:25-27:23.)  Indeed, she repeated Gering's calculation and analysis.  In this regard, the bottom line is that Riley – a witness upon whose expertise the jury will be asked to rely – largely adopted a report written by an individual whose qualifications are subject to serious question.  That is an appropriate subject of cross examination.  Had Riley merely been retained and performed an independent analysis the outcome would be different – her analysis

28

would be free from any possible reliance on Gering.  But that is apparently not what happened here.

The Court also does not find that rule 403 provides a basis to preclude this otherwise appropriate line of cross examination.  While Geistlich is likely correct that Luitpold will attempt to use any reliance on Gering as a basis to undermine Riley, that is what cross examination is all about.  That alone is an insufficient basis for a rule 403 preclusion. Riley's task will be to state clearly and convincingly the bases for her opinions and establish her reliability in the eyes of the jury.

C.  <u>Summary Judgment Ruling</u>

The Court has indicated that it intends to grant Geistlich summary judgment on Counts I, II, V, and VII of Luitpold's complaint. (ECF No. 300.) Luitpold has moved to preclude Geistlich from introducing evidence of the Court's indicative ruling.  (ECF No. 361.)  Geistlich does not disagree. (ECF No. 385.) Geistlich suggests that the jury should be instructed that there are no claims or issues in this case regarding Geistlich's termination of the contracts.  The Court agrees and will provide such an instruction at the appropriate time.

The Court therefore GRANTS Luitpold's third motion in limine. (ECF No. 361.)

D.  <u>Evidence Regarding NIBEC</u>

Luitpold has moved in limine to preclude Geistlich from presenting evidence related to NIBEC or its products OCS-B and OCS-H, or Equimatrix. (ECF No. 361.) According to Luitpold, the evidence is irrelevant under rule 402 and in any event

would mislead the jury under rule 403.  Luitpold grounds its irrelevancy argument principally on the fact that Luitpold did not sell or market any of the NIBEC products until after Geistlich terminated the agreement between Luitpold and Geistlich.  Luitpold proffers that OCS-H, or Equimatrix, was not approved by the FDA for marketing or sale in the United States until after the termination. Luitpold further argues that in all events its agreement to market OCS-B was terminated before it had ever made a sale.

Geistlich responds that its best efforts claim extends to a lack of effort prior to termination and that resources Luitpold spent on competing products are probative of Luitpold's efforts during that period.  Geistlich argues that "[t]he fact that Luitpold was planning to enter (and did) enter into an agreement with NIBEC is relevant to show Luitpold's breach of its obligations to use best efforts to market and sell Geistlich's products before the termination."  (ECF No. 385 at 6 (emphasis removed).)  The Court agrees only in part.

As discussed above, the best efforts provision is contractually defined to include efforts relating to entry and development of a market for Geistlich products and execution of a business plan.  In its opposition to this motion, Geistlich repeats the mistake of its proposed expert Dymek by interpreting that provision to impose an industry best efforts standard with regard to marketing and sales.  The determination of whether Luitpold met its contractual obligation with regards to Geistlich products must be based primarily on evidence of the efforts Luitpold undertook to enter and develop a market and execute a business plan.  Whether

30

Luitpold marketed and sold other products, unless that is tied proximately to a failure to enter and develop a market for Geistlich products or execute a business plan, is a detour that will confuse the jury and waste time.

While a great deal of resources in this litigation have obviously been spent on the issue of competing product sales, such expenditure cannot by its momentum create contractual obligations that the parties never intended.[4]  There was no exclusivity provision in the contractual arrangement between the parties.  Dr. Geistlich himself conceded as much in his deposition prior to his death.  (ECF No. 364, Bougher Decl. Exh. 3, Geistlich Tr. 22:4-24:10, 29:21-30:07, 31:19-32:19.)

However, there is some potential relevance to resources Luitpold spent on categories other than promoting its Geistlich products.  First, though Geistlich has not argued this, fact witnesses may testify about the analogy, if any exists, between developing a market for NIBEC products and the market development required under paragraph 2.02.  In addition, to the extent resources for market entry, market development, and executing on a particular business plan are finite, diversion of resources elsewhere could impeach evidence that those activities were pursued with "best efforts."

It does not appear that this articulation – particularly as directly tied to entry, development, and execution of a business plan – is what Geistlich has in

---

[4] The appeal of a prior decision by this Court to the Second Circuit involved the best efforts provision but not in a manner relevant to the in limine motions now before this Court.  Luitpold Pharm., Inc. v. Ed. Geistlich Söhne A.G. Fur-Chemische Industrie, 784 F.3d 78, 96.  The Second Circuit's decision involved the Court's decision to dismiss this claim on timeliness grounds.  In particular, it concerned the standard this Court had used in discussing whether there was an election of remedies issue as Geistlich had been aware of efforts to sell a Geistlich product, GEM21S, by December 2003.  The Second Circuit found that election of remedies did not require Geistlich to terminate and sue at that time; Geistlich was entitled to continue to accept performance without waiving its rights.

mind.  The evidence on this topic in recently submitted pre-trial materials is extensive and primarily focused on the fact of product competition.  Using the extensive NIBEC evidence to get at what is a narrow, straightforward point about allocating finite resources will ultimately mislead the jury as to the relevant issues and waste time.

Accordingly, the Court finds that in terms of the totality of such evidence, any probative value is substantially outweighed by a danger of confusing the issues, misleading the jury and wasting time.  See Fed. R. Evid. 403.  The Court will, however, allow very limited questioning – totaling no more than one hour on direct examination and one hour on cross-examination – on the NIBEC issue.  This includes deposition designations.  The Court will give the jury a special instruction that the contract is not exclusive, that entering into an agreement to market another product does not itself breach the contract, and that the jury is to use the evidence only to determine whether the later agreement impacted Luitpold's use of its best efforts as defined by the contract with Geistlich.  If the evidence were allowed without such an instruction, the jury would be led to believe that Luitpold was acting contrary to the contract when the evidence does not in fact tend to prove such a proposition.  This would mislead the jury.  The Court also notes that there are numerous trial exhibits and other evidence which Geistlich has included as part of its pre-trial order relating to the NIBEC products.  This indicates that these products would take up significant time on a nearly irrelevant issue.  The Court will

not allow this.  Luitpold's fourth motion in limine (ECF No. 361.) is therefore
GRANTED IN PART and DENIED IN PART.

    E.  <u>Peter S. Reichertz</u>

    Luitpold's final in limine motion seeks to preclude Geistlich from introducing
testimony (via deposition designation) from Peter S. Reichertz, Esq., an attorney
with the law firm Sheppard Mullin Richter & Hampton LLP, regarding his
representation of Luitpold and/or Geistlich during the time period relevant to the
breach of contract action. (ECF No. 361.) Reichertz represented Luitpold in various
matters relating to regulatory filings and represented NIBEC in connection with
the FDA approval process for OCS-H/Equimatrix.  He apparently also represented
both Luitpold and Geistlich simultaneously with respect to the Geistlich products
Luitpold was marketing and distributing, and further represented each party
separately with regard to other regulatory and trademark matters.  It seems that
Luitpold was Reichertz's biggest client and was responsible for significant revenues.
Luitpold argues that testimony from Reichertz should be precluded under both rule
402 and 403.  The Court agrees.

    It should be immediately clear that the lengthy deposition designations
relating to Reichertz's work for Luitpold generally, and his dual representation –
including whether or not it was a conflict of interest – has no probative value in this
trial.  The Court has read these designations and they are a waste of time.  None of
this testimony is probative of a fact in issue.  The entirety of his proposed testimony
on this issue is a sideshow that, even if relevant – and the Court finds it difficult to

imagine how it could be – would be confusing, misleading, and a waste of the jury's time.  The Court finds that those considerations substantially outweigh any de minimis probative value.  See Fed. R. Evid. 403.

The designations with regard to Reichertz's work in connection with the FDA filings for OCS-H/Equimatrix raise slightly different issues.  As set forth above, Counterclaim III regarding the best efforts provision does recite the OCS-H/Equimatrix facts as among those Geistlich deemed supportive of that claim.  (See ECF No. 38, C.CL. ¶¶ 46-55.)  But Reichertz does not have any first-hand knowledge of the limited potentially relevant facts; any knowledge he has is of collateral issues.  Reichertz's testimony is thus irrelevant in its entirety, and therefore Luitpold's fifth motion in limine (No. ECF 362.) is GRANTED.

F.  <u>Offer of Proof Requirement</u>

Geistlich's final motion in limine (ECF No. 352.) seeks a ruling that Luitpold must provide the Court with an offer of proof of compliance with the Court's requirement that evidence be non-duplicative before adducing any testimony from its rebuttal experts.  In light of the rulings above this motion is largely moot, but to the extent any of Luitpold's rebuttal experts do testify the motion is GRANTED.


        SO ORDERED.

Dated:          New York, New York
                September 16, 2015


                                    _____
                                        KATHERINE B. FORREST
                                        United States District Judge

35